# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JOHN CARVER, on behalf of himself and all other persons and entities similarly situated, )))) | )<br>)<br>)<br>) Civil Action No. _____<br>) |
| *Plaintiff*, ) | )<br>) **COMPLAINT - CLASS ACTION**<br>) |
| v. ) | )<br>) **JURY TRIAL DEMANDED**<br>) |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., )))) | )<br>)<br>)<br>) **ELECTRONICALLY FILED** |
| *Defendants.* ) | ) |

Plaintiff John Carver ("Plaintiff" or "Mr. Carver"), on behalf of himself and all other persons or entities similarly situated, hereby seeks injunctive relief, damages, and other monetary and equitable relief for Defendants' violations of federal and state antitrust laws, state consumer protection laws and state common law principles of unjust enrichment. Plaintiff alleges the following facts and claims upon knowledge as to matters relating to him, and upon information and belief as to all other matters:

## INTRODUCTION

1. This litigation arises from a series of actions undertaken by defendants Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. (collectively, "Boehringer" or "Defendants") to unlawfully maintain their monopoly on Mirapex®. Faced with the threat of losing market exclusivity, Defendants engaged in a series of anticompetitive and unlawful actions that ultimately extended their monopoly on the sale of

Mirapex®.  But for Defendants' unlawful actions, generic versions of Mirapex® could have been available as early as June 26, 2006—the date Boehringer's original, valid Mirapex® patent expired.

2.     Mirapex® is a branded prescription drug used to treat Parkinson's disease and Restless Leg Syndrome.  The active pharmaceutical ingredient in Mirapex® is pramipexole dihydrochloride ("pramipexole" or "pramipexole products").  Defendants have manufactured and sold Mirapex® since 1997 and, since that time, have reaped monopoly profits on Mirapex®.  Mirapex® has annual U.S. sales of approximately $380 million.

3.     At least three manufacturers of generic drugs—Barr Pharmaceuticals, Inc. ("Barr"), Mylan Pharmaceuticals, Inc. ("Mylan") and Alembic Limited ("Alembic")—developed generic versions of Mirapex® to sell in competition with Boehringer.  In their applications, these three manufacturers asserted that their products were bioequivalent to Mirapex® and did not infringe on any valid patent owned or licensed by defendants.  Because of Defendants' actions, however, no generic formulation of pramipexole has been made available to the market.

4.     To preserve its monopoly position, Defendants raised several barriers and unlawfully prevented competition from generic drugs that would have lowered prices to end-consumers including, but not limited to, the following:

     (a)     obtaining U.S. Patent No. 4,886,812 ("'812 Patent"), which it knew or should have known was invalid because the patent claimed the same compound for which Boehringer had already received patent protection in U.S. Patent No. 4,843,086 ("'086 Patent");

(b)     listing the '812 Patent in the Food and Drug Administration ("FDA") publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations" ("Orange Book") to raise entry barriers;

(c)     knowingly seeking a five-year extension of the invalid '812 Patent;

(d)     suing both Barr and Mylan in the United States District Court for the District of Delaware for allegedly violating this invalid patent with their generic versions of Mirapex® to keep them off the market;

(e)     on June 26, 2008, despite knowing that its claims were meritless, appealing the Delaware District Court's decision finding that the '812 Patent was invalid;

(f)     notwithstanding the Delaware District Court's ruling that the '812 Patent was invalid, filing an additional lawsuit in January 2009 in the United States District Court for the District of New Jersey, alleging that Mylan had infringed its invalid '812 Patent; and

(g)     on June 10, 2009, filing a notice of appeal of the New Jersey District Court's Order in May 2009 granting Mylan's motion to dismiss the litigation.

5.     After the Delaware District Court declared the '812 Patent invalid, Defendants conspired with Barr to further restrain trade and guarantee Defendants' unlawful monopoly power in the Mirapex® market by entering into an agreement whereby Barr: (a) would not contest the appeal; and (b) would not launch a competing pramipexole product until January 2010.  In return, Barr received a supply and co-promotion agreement to launch an authorized generic version of another drug, Aggrenox®, 18 months before Defendants' last patent for that drug listed in the Orange Book is set to expire.

6.     The combination of the litigation appeal and the conspiratorial agreement with Barr was designed to, and has had the effect of, further postponing the entry of a generic version of Mirapex® into the market by delaying Barr's generic launch and, thus, its  six-month exclusivity period before which other generic manufacturers (such as Mylan and Alembic) cannot enter.

7.     As a result of the unlawful acts described herein, Defendants have: (a) unreasonably restrained, suppressed and eliminated competition in the Mirapex® market; and (b) illegally maintained their monopoly in the Mirapex® market.  In return, this unlawful extension of market exclusivity has directly and proximately resulted in impeding generic competition, denying end-consumers the benefits of free and unrestrained competition, and enabling Defendants to reap millions of dollars in ill-gotten monopoly profits at the end-consumer's expense.

## THE PARTIES

8.     Plaintiff John Carver is a resident of Massachusetts.  During the Class Period, Mr. Carver indirectly purchased Mirapex® from Defendants and, thus, was injured by the illegal conduct alleged herein.

9.     Defendant Boehringer Ingelheim International GmbH is a limited partnership organized and existing under the laws of Germany, having its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

10.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut  06877.

## CO-CONSPIRATORS

11.     Various other corporations, organizations, firms and individuals, not made defendants in this Complaint, including, *inter alia*, manufacturer Barr, participated as co-conspirators in the violations alleged herein, and performed acts in furtherance thereof.

## JURISDICTION AND VENUE

12.     This action is brought under Section 16 of the Clayton Act, 15 U.S.C. §26, for injunctive relief, and the costs of suit, including reasonable attorneys' fees, for injuries to Plaintiff and members of the Class resulting from, *inter alia*, defendants' violations of the federal antitrust laws.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337 and 15 U.S.C. §26.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

13.     Venue is proper in this judicial district pursuant to 15 U.S.C. §22, and 28 U.S.C. §1391(b) because defendants reside, transact business, are found, and/or have agents in this district, and because a substantial portion of the affected trade and commerce described below has been carried out in this district.

## RELEVANT MARKETS

14.     To the extent applicable to the claims alleged herein, the relevant product market is the market for the manufacture and sale of Mirapex® and its generic bioequivalents.

15.     The relevant geographic market is the United States as a whole (for Counts I and IV), the Indirect Purchaser States (for Count II), and the Unfair and Deceptive Trade Practices States (for Count III).

16.     Defendants' market share in the relevant product and geographic markets was and continues to be 100%.

## INTERSTATE TRADE AND COMMERCE

17.     At all times relevant herein, Defendants manufactured, marketed and sold substantial amounts of Mirapex® in a continuous and uninterrupted flow of interstate commerce.

18.     Defendants utilized the United States mails and interstate and international telephone lines, as well as means of interstate and international travel, in order to effectuate their scheme to monopolize the market for Mirapex® and its generic bioequivalents.

19.     The illegal monopolization and attempted monopolization has, therefore, substantially affected interstate and foreign commerce.

## FACTUAL ALLEGATIONS

### Background On The U.S. Pharmaceutical Industry

20.     Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*. ("FDCA" or "Act"), approval by the FDA is required before a company may begin selling a drug. Pre-market approval for a new drug, often referred to as a "pioneer" or "branded" drug, must be sought by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use. New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents, which provide the patent owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period ("FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, codified at 21 U.S.C. § 355(j) ("Hatch-Waxman Act") and 35 U.S.C. § 271(e).

21.     In addition to safety and efficacy information, NDA applicants must submit to the FDA a list of all patents purporting to cover drug for which FDA approval is being sought, or

that claim a method of using that drug, for which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug.

22.     Following NDA approval, the FDA lists any patents referenced in the NDA application in the Orange Book, where patents can be easily found and consulted by future FDA applicants.

23.     Also following NDA approval, if a pioneer drug manufacturer obtains a new patent claiming the drug or its use, the manufacturer must supplement its NDA by submitting information on the new patent within 30 days of issuance. The new patent is then listed in a supplement to the Orange Book.

24.     However, because the FDA must accept the new patent information as true and withhold subsequent drug applications whenever the patent holder presents a litigated dispute (no matter how baseless), the FDA is effectively powerless to stop unscrupulous patent holders which provide it with bogus information or file frivolous patent-infringement actions.

25.     Generic drugs are those which the FDA has found to be bioequivalent to branded drugs (*i.e.*, generic drugs have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs). Where a generic drug is completely bioequivalent, the FDA assigns the generic version an "AB" rating.

26.     Invariably, generic drugs are priced significantly below the branded drugs to which they are bioequivalent (typically at least 30% lower). As additional generic competitors come to market, normally prices fall even further. As a result, unless the branded manufacturer lowers its prices to meet its competitors, generic manufacturers quickly capture market share from the brand-name manufacturer.

27.     Exacerbating this effect are "automatic substation" laws which, in many states, require pharmacists to substitute AB-rated generics for branded drugs unless the physician has specifically indicated the prescription as "dispense as written" or some similar indication.

28.     Therefore, the price competition created by generic drug manufacturers' entry into a market benefits all purchasers of a drug, who are able to achieve the same therapeutic benefits at substantially lower prices.

29.     Due to these benefits, Congress passed the "Hatch-Waxman Amendments" to the Act in 1984 in order to simplify and shorten the approval process for generic drugs. The Hatch-Waxman Amendments permit generic drug manufacturers to file an Abbreviated New Drug Application ("ANDA") that expedites the drug approval process.

30.     Under the expedited ANDA process, if a generic drug is bioequivalent to the branded drug and receives an AB-rating, it will receive FDA approval without the need for clinical trials and the clearing of other regulatory hurdles required for pioneer drugs.

31.     In an ANDA application, the filer must make one of four certifications to the FDA regarding the existence, or lack thereof, of patents purporting to cover the pioneer drug:

>    (a)     that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");
>
>    (b)     that the patent for the pioneer drug has expired (a "Paragraph II Certification");
>
>    (c)     that the patent for the pioneer drug will expire on a particular date, and that the filer does not seek to market its generic production before that date (a "Paragraph III Certification"); or

(d)     that the patent for the pioneer drug is invalid or will not be infringed upon

by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. §355(j)(2)(A)(vii).

32.     In the event that an ANDA applicant seeks approval to market a generic version of a drug before the expiration of one or more patents listed in the Orange Book as covering that drug, the ANDA filer has no choice but to file a Paragraph IV Certification.

33.     Upon receiving a Paragraph IV Certification, the purported patent holder is afforded 45 days in which to initiate a patent infringement suit against the ANDA application.  If an action is brought with that period, the FDA cannot grant final approval of the ANDA until the earlier of: (a) the expiration of the patent; (b) 30 months from the patent-holder's receipt of notification of the Paragraph IV Certification; or (c) the date on which a final judgment is entered in the patent infringement case holding that such patent is invalid, not infringed, or unenforceable.

34.     Therefore, a branded drug manufacturer can generally prevent entry of a generic drug for years simply by filing a patent infringement action even if the claims are completely meritless.

35.     Where an ANDA applicant has satisfied all FDA regulatory requirements but the 30-month stay period has not expired, the FDA will grant tentative approval of the ANDA.  This commonly signifies that the FDA would have granted a final approval but-for the stay period. Despite receiving tentative approval, however, the ANDA applicant cannot sell the generic product in the United States until it has received final approval from the FDA.

36.     In addition to providing the expedited ANDA process for generic drugs, the Hatch-Waxman Amendments provide further incentive to generic manufacturers by providing

the first ANDA filer for a generic version of a branded drug listed in the Orange Book a 180-day period of marketing exclusivity ("180-day exclusivity"). During that 180-day exclusivity period, no other generic manufacturers may enter the market.

37.    The 180-day exclusivity period begins to run from the earlier of: (a) first date on which the ANDA product is commercially marketed; or (b) the date on which a court enters a final, non-appealable decision of invalidity or non-infringement regarding the listed patent. If the first ANDA filer does not launch its generic product within 75 days of one of these triggering events, the 180-day exclusivity period is forfeited.

**Mirapex® and Pramipexole Dihydrochloride**

38.    Mirapex® is manufactured, marketed and sold by Boehringer throughout the entire United States. On July 1, 1997, Boehringer received approval from the FDA for Mirapex® for the treatment of Parkinson's disease. In November 2006, the FDA further approved Mirapex® for the treatment of moderate to severe Restless Leg Syndrome, also known as Wittmaack-Ekbom's Syndrome.

39.    As of today, there are only three companies that have received either tentative or final approval from the FDA to market generic versions of Mirapex®: Mylan (tentative approval received May 8, 2007); Barr (tentative approval received October 29, 2007 and final approval received February 19, 2009); and Alembic (tentative approval received July 20, 2009). But for Defendants' unlawful conduct, one or more of these manufacturers would have offered a generic product to compete with Mirapex®.

40.    The generic pramipexole products developed by Mylan, Barr and Alembic are AB-rated equivalents to Boehringer's branded Mirapex® drug, which means they are considered bioequivalent substitutes and may be automatically substituted for Mirapex® under certain state laws. As a result, the AB-rated equivalents are perfect competitive substitutes for Mirapex®.

41.     The generic pramipexole products would be priced substantially below the price Boehringer charges for Mirapex®.  Because Mirapex® and its AB-rated equivalents are competitive substitutes and would be offered for a lower price, but for Defendants' misconduct, Plaintiff and the other members of the Class would have paid substantially lower prices for Mirapex® and its generic bioequivalents during the Class Period.

**Defendants' Unlawful Scheme To Extend Its Mirapex® Monopoly**

42.     Although several generic drug manufacturers sought approval to market generic versions of Mirapex® in the United States, and although the products for which approval was sought did not infringe upon any valid patent, these generics have not come to market because of Defendants' unlawful and anticompetitive conduct.  This conduct included: (a) obtaining the '812 Patent, which it knew or should have known was invalid because the patent claimed the same compound for which Boehringer had already received patent protection; (b) listing the '812 Patent in the Orange Book; (c) seeking a five-year extension of the invalid '812 Patent;  (d) suing both Barr and Mylan for violations of this invalid patent; (e) appealing the Delaware District Court's decision finding that the '812 Patent was invalid; (f) filing an additional lawsuit in the United States District Court for the District of New Jersey, alleging infringement on its invalid '812 Patent; and (g) appealing the New Jersey District Court's Order granting Mylan's motion to dismiss the litigation despite knowing that its claims were meritless.

43.     In November 1987, Defendants applied for the '086 Patent, covering a method of treatment using tetrahydro-benzothiazoles, including the compound pramipexole.

44.     While the '086 Patent application was pending, Defendants filed a second application for the '812 Patent, covering the pramipexole compound without reference to methods of treatment.

11

45.     The '812 Patent, which applied for protection of a drug or method of treatment already covered by the '086 Patent, is a classic example of "double patenting."  A patent obtained through double patenting is invalid and cannot be infringed.

46.     On June 27, 1989, the U.S. Patent and Trademark Office ("PTO") approved the '086 Patent, and on December 12, 1989, the PTO approved the '812 Patent.  Defendants applied for the '812 Patent despite the fact that it knew or should have known that it covered the same compound claimed in the '086 Patent and, thus, constituted invalid double-patenting.

47.     Nonetheless, Defendants listed both patents in the Orange Book under the same specification and title, "Tetrahydro-Benzothiazoles, The Preparation Thereof and Their Use as Intermediate Products or as Pharmaceuticals."

48.     Section 156 of the United States Patent Act ("Section 156") allows for the term of a patent to be extended where the commercial exploitation of the patented product is delayed by the applicant's seeking regulatory approval, such as by the FDA.  The extension period lasts between the date the patent was granted and the date of marketing approval.  Only one, unexpired patent per approved product may be extended.

49.     On July 28, 1997, Defendants sought an extension under Section 156 for its invalid '812 Patent, which was to expire on December 12, 2006.  The extension request was ultimately granted, extending the '812 Patent's expiration date until March 25, 2011.  Defendants chose to seek a Section 156 extension of the invalid '812 Patent, as opposed to the original '086 Patent, in order to extend its monopoly as far into the future as possible.

50.     On May 27, 2005, Barr filed an ANDA seeking FDA approval to market and sell a generic pramipexole 0.25 mg product that would have been bioequivalent to branded Mirapex®.

12

51.     On June 24, 2005, Barr amended its ANDA to cover other dosages of generic pramipexole products (0.125, 0.5, 1.0 and 1.5 mg) that would also have been bioequivalent to branded Mirapex®.

52.     On August 10, 2005 and September 12, 2005, Barr sent Defendants a letter notifying them that Barr had filed a Paragraph IV Certification asserting that their '812 Patent was either invalid or would not be infringed by Barr's generic product.

53.     Defendants then sued Barr to enforce the '812 and the '086 Patents, even though they knew or should have known that their claims based on the '812 Patent were objectively groundless due to improper double-patenting.  Defendants' motive for bringing this meritless infringement was to unlawfully extend its monopoly, thus enabling them to continue charging supra-competitive prices for Mirapex® even after their '086 Patent would have expired.

54.     As mandated by the Hatch-Waxman Amendments, Defendants' infringement suit, despite being completely meritless, automatically triggered a 30-month stay thwarting approval of generic versions of Mirapex® despite being completely .

55.     On August 26, 2005, a second generic manufacturer, Mylan, filed its own ANDA seeking approval to market and sell generic versions of Mirapex®.  Mylan informed Defendants that it had filed a Paragraph IV Certification via letter on October 26, 2005 and, within 45 days, was it too was sued by Defendants for patent infringement relating to the '812 Patent.

56.     Defendants' filing of an infringement lawsuit against Mylan also triggered an automatic 30-month stay from the date it received Mylan's notice letter, preventing Mylan from receiving FDA approval and launching its generic versions of Mirapex®.

57.     On June 26, 2006, Defendants' original '086 Patent expired.  Nonetheless, Defendants continued to pursue their patent infringement claims against Mylan and Barr to enforce its invalid '812 Patent, litigating all the way through a bench trial on the merits.

58.     On March 11, 2008, at the conclusion of the bench trial and after subjecting the generic manufacturers to almost three years of meritless litigation, Defendants made the calculated decision to file a terminal disclaimer with the PTO.  A terminal disclaimer is a binding statement made with the PTO when more than one patent has been obtained on the same invention, thus signifying that the later patent will expire at the same time as the earlier patent. When exercised properly, a terminal disclaimer can be used to cure double-patenting problems.

59.     Although the proper filing of a terminal disclaimer ordinarily can cure the problems caused by double patenting, Defendants' disclaimer was improperly filed almost two years after the earlier-issued '086 Patent had expired and three years after they brought their sham patent infringement suits against Mylan and Barr.

**The Delaware District Court Declares Boehringer's '812 Patent Invalid**

60.     On June 26, 2008, Judge Farnan of the U.S. District Court for the District of Delaware (the "Delaware District Court") issued an Opinion and Order in *Boehringer Ingelheim Int'l GmbH v. Barr Labs. Inc., et al.*, 562 F.Supp.2d 619 (D. Del. June 26, 2008).  That Opinion and Order held, by clear and convincing evidence, that the '812 Patent was invalid due to nonstatutory double patenting.

61.     In that Opinion and Order, the Delaware District Court found that it would be impossible to practice the claims in the '086 Patent without necessarily using or forming the compounds claimed in the '812 Patent.  In so finding, the court further added, "allowing Boehringer to secure a new patent on a compound which was itself specifically identified in the

14

earlier method claims of the '086 patent is precisely the type of monopolistic conduct the doctrine of nonstatutory double patenting was designed to prevent." *Id.* at 639.

62.     The Delaware District Court further concluded that the terminal disclaimer filed by Defendants was "ineffective" because a terminal disclaimer cannot overcome an obviousness-type double patenting problem where the earlier patent has already expired. *Id.* at 631-32.  In so concluding, the court expressed concern about the timing of Defendants' terminal disclaimer stating that an "unreasonable delay" in filing can extend a monopoly, which is counter to the purpose of the terminal disclaimer provision, and because "extensive delay in filing a document which may ultimately moot a double patenting issue can have harsh effects on the judicial system as a whole resulting in gamesmanship during trial, and/or a waste of the Court's and the parties' resources." *Id.* at 632 n.8.

63.     Even after the Delaware District Court declared the '812 Patent invalid, Defendants continued their elaborate scheme to unlawfully maintain monopoly power in the Mirapex® market by delaying the entry of a final judgment and appealing the court's decision to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit").  Tellingly, in their appeal to the Federal Circuit, Defendants do not challenge or even address the Delaware District Court's holding that the '812 Patent represented invalid double-patenting.

64.     At oral argument in the Federal Circuit, two members of the panel noted that permitting a terminal disclaimer to a patent after its expiration would effectively allow patent holders to "misuse the patent during the period before the disclaimer to discourage competition," and questioned Defendants' counsel whether that should be allowed.[1]

---

[1] Oral argument, *available at* http://oralarguments.cafc.uscourts.gov/mp3/2009-1032.mp3**.**

65.     On January 26, 2009, notwithstanding the decision by the Delaware District Court or the pending appeal in the Federal Circuit, Defendants filed a new complaint against Mylan in New Jersey District Court for allegedly infringing its judicially-invalidated '812 Patent with respect to a 0.75 mg pramipexole product.  The sole purpose of this baseless litigation was to further delay entry of a generic 0.75 mg pramipexole product, thus enabling Defendants to squeeze even more unlawful monopoly profits out of end-consumers.

66.     Not surprisingly, following oral argument, the New Jersey District Court granted Mylan's motion to dismiss from the bench in May 2009.  Again not surprisingly, Defendants filed another meritless notice of appeal to the Federal Circuit on June 10, 2009.

**Boehringer Conspires With A Potential Competitor To Guarantee Extension Of Its Unlawful Monopoly**

67.     At the same time it elected to appeal the decision of the Delaware District Court, Defendants simultaneously reached a settlement with Barr, the first-filer of an ANDA application for generic Mirapex®.

68.     Although the full terms of the agreement have not been made public, it has been reported that Barr agreed not to contest Defendants' appeal and not to launch a competing pramipexole product until January 2010.  In return, Barr received a supply and co-promotion agreement to launch an authorized generic version of totally different drug, Aggrenox®, 18 months before Boehringer's last patent for that drug is set to expire.

69.     Barr also has not relinquished its rights to the 180-day exclusivity period as first ANDA filer for generic Mirapex®.  As a result, other potential generic manufacturers of pramipexole products have been wrongfully prevented from launching their generics until either 75 days from the affirmance of the Delaware District Court's decision by the Federal Circuit or,

if Barr launches its pramipexole products within that period, 180 days after Barr's commercial launch.

70.     Thus, the conspiracy between Defendants and Barr—the first applicant to file an ANDA for generic Mirapex®—has succeeded in ensuring that generic competition in the Mirapex® market will continue to be unlawfully restrained, and Defendants will continue to receive ill-gotten monopoly profits at the expense of Plaintiff and the other members of the Class.

**Damage And Harm Caused By Defendants' Unlawful Conduct**

71.     Defendants' conduct had the purpose and effect of eliminating competition and wrongfully extending its monopoly power, thus enabling Defendants to continue to charge supra-competitive prices for Mirapex®.

72.     Defendants have engaged in monopolistic practices and entered into a conspiratorial agreement concerning Mirapex® in order to avoid the loss in market share and revenues that would inevitably result from the introduction of generic competition in the Mirapex® market.

73.     But for Defendants' misconduct, other manufacturers would have launched generic pramipexole products as early as June 26, 2006, the date Boehringer's '086 Patent expired.  As a result, Plaintiff and the other members of the Class have been denied the opportunity to purchase less expensive generics equivalent to Mirapex® and will continue to pay supra-competitive prices for pramipexole products.

74.     If a generic competitor had been able to enter the relevant market and compete with Defendants, end-consumers such as Plaintiff would have been free to substitute a lower-priced generic for the higher-priced brand name drug and the Class would have paid less for Mirapex® and pramipexole products.  As noted above, pharmacists generally are permitted, and

in many instances are required, to substitute generic drugs for their branded counterparts, unless the prescribing physician has directed that the branded product be dispensed.  In addition, third-party payors of prescription drugs (*e.g.*, managed care plans) encourage or insist on the use of generic drugs whenever possible.  A generic product can quickly and efficiently enter the marketplace at substantial discounts, generally leading to a significant erosion of the branded drug's sales within the first year

75.     By preventing generic competitors from entering the market, Defendants injured Plaintiff and the other Class members in their business or property by causing them to pay more for Mirapex® and pramipexole products than they otherwise would have paid.  Thus, Defendants' unlawful conduct deprived Plaintiff and other end-consumers of the benefits of competition that the antitrust laws and applicable state consumer protection laws were designed to preserve.

76.     Defendants' unlawful conduct is continuing, and without the intervention of the Court, end-consumers face continuing damage and injury from the continued exclusion of generic pramipexole products from the market.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, specifically Rule 23(b)(2) and (3), on behalf of the following class ("Class"):

> All persons and entities in the United States who, at any time from June 26, 2006 until present (or whatever time in the future Defendants cease their anticompetitive behavior, generics enter the relevant market, and a competitive pricing prevails) indirectly purchased Mirapex® in the United States other than for re-sale.  Excluded from the Class are the Defendants, their subsidiaries and affiliates, and government entities.  For purposes of the Class definition, persons and entities "purchased" Mirapex® if they paid some or all of the purchase price.

78.     Plaintiff believes that there are thousands of members in the above-described Class; their exact number and identities being currently unknown to Plaintiff, but known to Defendants and/or ascertainable from appropriate discovery.

79.     Among the questions of law and fact common to the Class are:

(a)     whether Defendants have unlawfully monopolized or attempted to monopolize the market for Mirapex®;

(b)     whether Defendants possessed and/or unlawfully extended their monopoly power over the market for Mirapex®;

(c)     whether Defendants, through their monopolization and/or attempted monopolization, have caused the prices of Mirapex® to be maintained at supra-competitive levels;

(d)     whether Defendants' patent infringement lawsuits against companies seeking to manufacture, market and sell generic Mirapex® constitute unlawful conduct;

(e)     whether the agreement between Defendants and Barr which has prevented Barr, and thus other generic manufacturers, from entering the Mirapex® market constitutes an unlawful contract, combination or conspiracy in restraint of trade;

(f)     whether the Class suffered and continues to suffer antitrust injury; and

(g)     whether Defendants were and continue to be unjustly enriched to the detriment of the Class, entitling Plaintiff and the Class to disgorgement of all monies resulting therefrom.

80.     Plaintiff's claims are typical of the Class because he and all members of the

Class were injured and continue to be injured in the same manner by defendants' unlawful, anti-competitive and inequitable methods, acts and practices, and wrongful conduct in the conspiracies complained of herein, *i.e.,* they have paid supra-competitive and artificially high prices for Mirapex® and will continue to be forced to do so until the markets for Mirapex® are competitive.

81.     Plaintiff will fully and adequately protect the interests of all members of the Class.  Plaintiff has retained counsel who are experienced in antitrust class action litigation. Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

82.     The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

83.     The Class is readily definable and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims which would otherwise be too small to support the expense of individual, complex litigation.

84.     Defendants have acted or refused to act, as alleged herein, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

### Declaratory And Injunctive Relief Under Section 16 of the Clayton  Act for Violations of Sections 1 and 2 of the Sherman Act

85.     Plaintiff incorporates by reference the preceding allegations.

86.     To the extent applicable to this and other claims alleged in this complaint, the relevant product market is the market for the manufacture and sale of Mirapex® and its generic

bioequivalents. The relevant geographic market is the United States as a whole. Defendants' market share in the relevant product and geographic markets has been and continues to be 100%.

87. Pursuant to U.S. patent laws, Defendants were given a lawful monopoly over sales of prescription Mirapex® drug products, but that monopoly was only lawful so long as the drug, or a method of its use, was fully covered by valid, unexpired patents.

88. Defendants knowingly and willfully engaged in a course of conduct designed to unlawfully extend their monopoly power. This course of conduct included, *inter alia*:

> (a)  listing the '812 Patent in the Orange Book to raise entry barriers;
>
> (b)  knowingly seeking a five-year extension of the invalid '812 Patent;
>
> (c)  suing both Barr and Mylan in the United States District Court for the District of Delaware for allegedly violating this invalid patent with their generic versions of Mirapex® to keep them off the market;
>
> (d)  on June 26, 2008, despite knowing that its claims are meritless, appealing the Delaware District Court's decision finding that the '812 Patent was invalid;
>
> (e)  notwithstanding the Delaware District Court's ruling that the '812 Patent was invalid, filing an additional lawsuit in January 2009 in the United States District Court for the District of New Jersey, alleging that Mylan had infringed its invalid '812 Patent; and
>
> (f)  on June 10, 2009, filing a notice of appeal of the New Jersey District Court's Order in May 2009 granting Mylan's motion to dismiss the litigation.

89. Defendants' filing and defense of obviously invalid patents violates Section 2 of the Sherman Act. Defendants filed and defended the subsequent patents with knowledge that they were invalid due to nonstatutory double patenting. The intended effect of these objectively

baseless actions was to delay the introduction of generic formulations of Mirapex® into the market.

90.     Defendants' agreement with Barr to prevent all generic versions of Mirapex® from entering the market violates Section 1 of the Sherman Act.  The agreement was designed to, and has the effect of, restraining competition in the Mirapex® market by virtue of a contract, combination or conspiracy amongst horizontal competitors.

91.     Defendants' filing and defense of obviously invalid patents are part of a policy of Defendants, sometimes euphemistically referred to in the industry as "life-cycle management," to file patents without regard to their merits and for the purpose of injuring competitors.  Indeed, Defendants have acknowledged that they seek to be "clever" with their patents in order to defend their "life cycle" through on-going programs at Defendants' businesses.

92.     During the Class Period, Defendants possessed monopoly power in the relevant market.  Defendants intentionally and wrongfully maintained their monopoly power in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.  While obtaining and possessing their unlawful monopoly power over the market for Mirapex®, Defendants set, maintained and raised the price of Mirapex® to artificially high and/or supra-competitive levels.

93.     Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violation alleged in this Count.  Their injury consists of paying higher prices for Mirapex® and pramipexole products than they would have paid in the absence of such violations.  The resulting injuries are of the type antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

94.     Plaintiff and members of the Class are likely to purchase Mirapex® again in the future.

95.     Injunctive relief is, therefore, appropriate under 15 U.S.C. §26.  Plaintiff seeks to enjoin Defendants from engaging in future anti-competitive practices concerning the manufacture, distribution or sale of Mirapex®.  Plaintiff does not seek damages under Count I.

## COUNT II

## Damages Under State Antitrust Laws

96.     Plaintiff incorporates by reference the preceding allegations.

97.     As described above, Defendants knowingly and willfully engaged in a course of conduct designed to unlawfully extend its monopoly power.  This course of conduct included, *inter alia*, improperly filing the '812 Patent which resulted in nonstatutory double-patenting in order to prevent Barr, Mylan, Alembic and other potential generic manufacturers from entering the Mirapex® market, and later, after the '812 Patent was declared invalid by a federal court, conspiring with Barr (the first manufacturer to file an ANDA for a generic version of Mirapex®, thus entitling it to the 180-day generic exclusivity period) to prevent its launch of a Mirapex® bioequivalent drug, thus extending Boehringer's unlawful monopoly.  Thus, Defendants maintained their monopoly power in the Mirapex® market through both: (a) an agreement or conspiracy with the purpose and effect of unreasonably restraining trade; and (b) the intentional and wrongful maintenance of monopoly power.

98.     During the Class Period, Defendants possessed monopoly power in the relevant market.

99.     Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Arizona Revised Stat. §44-1401, *et seq.*, with respect to purchases of Mirapex® in Arizona by members of the Class.

100.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Cal. Bus. & Prof. Code §16700, *et seq.*, and Cal. Bus. & Prof. Code §17200, *et seq.* with respect to purchases of Mirapex® in California by members of the Class.

101.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of D.C. Code Ann. §28-4501, *et seq.* with respect to purchases of Mirapex® in District of Columbia by members of the Class.

102.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Fla. Stat. §501, Part II, *et seq.* (Florida Deceptive and Unfair Trade Practices Act) , and Chapter 542.15, *et seq.* (Florida Antitrust Act) with respect to purchases of Mirapex® in Florida by members of the Class.

103.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the Iowa Code, Title XIII, Subtitle 5, Chapter 553 (Iowa Competition Law) with respect to purchases of Mirapex® in Iowa by members of the Class.

104.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Kan. Stat. Ann. §50-101, *et seq.*, with respect to purchases of Mirapex® in Kansas by members of the Class.

105.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of

La. Rev. Stat. §51:137, *et seq.*, with respect to purchases of Mirapex®in Louisiana by members of the Class.

106.     Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Me. Rev. Stat. Ann. 10 §1101, *et seq.,* with respect to purchases of Mirapex® in Maine by members of the Class.

107.     Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §445.771, *et seq.* with respect to purchases of Mirapex® in Michigan by members of the Class.

108.     Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §325D.49, *et seq.*, with respect to purchases of Mirapex® in Minnesota by members of the Class.

109.     Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Miss. Code Ann. §75-21-1, *et seq.*, with respect to purchases of Mirapex® in Mississippi by members of the Class.

110.     Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the Revised Statutes of Nebraska, R.R.S. Neb. §59-800, *et seq.,* with respect to purchases of Mirapex® in Nebraska by members of the Class.

111.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. Ann. §598A., *et seq.*, with respect to purchases of Mirapex® in Nevada by members of the Class.

112.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of New Jersey Consumer Fraud Act, N.J. Stat. Ann. §56:8-1, *et seq.*, with respect to purchases of Mirapex® in New Jersey by members of the Class.

113.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1, *et seq.*, with respect to purchases of Mirapex® in New Mexico by members of the Class.

114.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market violation of New York Gen. Bus. Law §340, *et seq.* with respect to purchases of Mirapex® in New York by members of the Class.

115.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of N.C. Gen. Stat. §75-1, *et seq.* with respect to purchases of Mirapex® in North Carolina by members of the Class.

116.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of

N.D. Cent. Code §51-08.1-01, *et seq.*, with respect to purchases of Mirapex® in North Dakota by members of the Class.

117.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Or. Rev. Stat. §646.705, *et seq.*, with respect to purchases of Mirapex® in Oregon by members of the Class.

118.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the Puerto Rico Antitrust Act of 1964, P.R. Laws Ann. Tit. 10 §258, *et seq.* with respect to purchases of Mirapex® in Puerto Rico by members of the Class.

119.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of S.D. Codified Laws Ann. §37-1, *et seq.*, with respect to purchases of Mirapex® in South Dakota by members of the Class.

120.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Tenn. Code Ann. §47-25-101, *et seq.*, with respect to purchases of Mirapex® in Tennessee by members of the Class.

121.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Vt. Stat. Ann. 9, §2453, *et seq.*, with respect to purchases of Mirapex® in Vermont by members of the Class.

122.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of the West Virginia Antitrust Act, W.Va. Code §47-18-l, *et seq.*, with respect to purchases of Mirapex® in West Virginia by members of the Class.

123.    Defendants have intentionally and wrongfully maintained their monopoly power, and entered into an unlawful conspiracy to restrain trade, in the relevant market in violation of Wis. Stat. §133.01, *et seq.*, with respect to purchases of Mirapex® in Wisconsin by members of the Class.

124.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count.  Their injury consists of paying higher prices for Mirapex® drug products than they would have paid in the absence of those violations.  This injury is of the type the antitrust and consumer protection laws of the above States and the District of Columbia were designated to prevent and flows from Defendants' unlawful conduct.

## COUNT III

## Damages Under Applicable Unfair and Deceptive Trade Practices Under State Law

125.    Plaintiff incorporates by reference the preceding allegations.

126.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed in ¶¶156-199 when they re-filed prior art and obtained invalid patents in order to prevent the FDA from granting final approval of pending applications of would-be competitors to market generic Mirapex®.  As a direct result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and members of the Class were deprived of the opportunity to purchase generic Mirapex®.

127.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Alaska Stat. §45.50.471, *et seq.*

128.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Ariz. Rev. Stat. §44-1522, *et seq.*

129.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Ark. Code §4-88-101, *et seq.*

130.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

131.    Defendants have engaged in unfair competition or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. §6-l-105, *et seq.*

132.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b, *et seq.*

133.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of 6 Del. Code §2511, *et seq.*

134.    Defendants have engaged in unfair competition or deceptive acts or practices or made false representations in violation of D.C. Code Ann. §28-3901, *et seq.*

135.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Fla. Stat. §501.201, *et seq.*

136.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Ga. Stat. §10-l-392, *et seq.*

137.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Haw. Rev. Stat. §480, *et seq.*

138.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Idaho Code §48-601, *et seq.*

139.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of 815 Ill. Comp. Stat. §505.l, *et seq.*

140.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Kan. Stat. Ann. §50-623, *et seq.*

141.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Ky. Rev. Stat. §367.110, *et seq.*

142.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of La. Rev. Stat. §51:1401, *et seq.*

143.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of 5 Me. Rev. Stat. Ann. §207, *et seq.*

144.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Md. Com. Law Code §13-101, *et seq.*

145.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Mass. Ann. Laws ch. 93A, *et seq.*

146.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Mich. Stat. §445.901, *et seq.*

147.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Minn. Stat. §8.31, *et seq.*

148.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Mo. Ann. Stat. §407.010, *et seq.*

149.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Mont. Code §30-14-101, *et seq.*

150.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601, *et seq.*

151.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903, *et seq.*

152.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of N.H. Rev. Stat. §358-A:1, *et seq.*

153.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of violation of N.J. Rev. Stat. §56:8-l, *et seq.*

154.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of N.M Stat. §57-12-1, *et seq.*

155.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §349, *et seq.*

156.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of N.C. Gen. Stat. §§75-l.1, *et seq.*

157.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of N.D. Cent. Code §51-15-01, *et seq.*

158.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Ohio Rev. Stat. §1345.01, *et seq.*

159.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Okla. Stat. 15 §751, *et seq.*

160.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Or. Rev. Stat. §646.605, *et seq.*

161.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of 73 Pa. Stat. §201-1, *et seq.*

162.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, *et seq.*

163.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of S.C. Code Laws §39-5-10, *et seq.*

164.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of S.D. Code Laws §37-24-l, *et seq.*

165.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Tenn. Code Ann. §47-18-101, *et seq.*

166.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Tex. Bus. & Com. Code §17.41, *et seq.*

167.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Utah Code §13-11-1, *et seq.*

168.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Vt. Stat. §2451, *et seq.*

169.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Va. Code §59.l-196, *et seq.*

170.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Wash. Rev. Code §19.86.010, *et seq.*

171.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of W. Va. Code §46A-6-101, *et seq.*

172.     Plaintiff and members of the class have been injured in their business and property by reason of Defendants' anticompetitive, unfair or deceptive acts alleged in this Count. Their injury consists of paying higher prices for Mirapex® and pramipexole products than they would have paid in the absence of these violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT IV

### Unjust Enrichment Under State Law

173.     Plaintiff incorporates by reference the preceding allegations.

174.     Defendants have benefited from their unlawful acts through the overpayments for Mirapex® and pramipexole products by Plaintiff and other Class members and the increased profits resulting from such overpayments.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiff and other Class members and retained by Defendants.

175.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiff and the other Class members may make claims on a pro-rata basis for restitution.

### DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants for the following relief

A.    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as the representative of the Class, and designating his counsel as counsel for the Class;

B.    A declaration that Defendants have committed the violations alleged herein;

C.    A judgment for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

D.    Disgorgement of Defendants' unjust enrichment;

E.    An injunction preventing Defendants from engaging in future anticompetitive practices concerning the manufacture, distribution or sale of Mirapex;

F.    The costs of this suit, including reasonable attorneys' fees; and

G.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Mr. Carver demands a trial by jury as to all issues of right to a jury.

LAW OFFICE OF ALFRED G. YATES JR., PC


Date: August 7, 2009                    By:    s/ Alfred G. Yates, Jr.
                                               Alfred G. Yates, Jr. (PA17419)
                                               Gerald L. Rutledge, Esq. (PA62027)
                                        519 Alleghany Building
                                        429 Forbes Avenue
                                        Pittsburgh, PA 15219
                                        Telephone: (412) 391-5164
                                        Facsimile: (412) 471-1033
                                        e-mail: yateslaw@aol.com

Joseph J. Tabacco, Jr.
jtabacco@bermandevalerio.com
Todd Seaver
tseaver@bermandevalerio.com
Matthew Ruan
mruan@bermandevalerio.com
BERMAN DEVALERIO
425 California Street, Suite 2100
San Francisco, CA 94104-2205
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Counsel for Plaintiff John Carver*